Allen, J.
The first objection which presents itself is the staleness of the demand, and the impossibility of doing justice at this distance of time. The court is called upon to investigate, by the dim lights furnished by this record, transactions which occurred thirty years *166 before the institution of this suit. The cases on this subject are fully reviewed and commented on in Carr's adm'r &c. v. Chapman's legatees, 5 Leigh 164. and Hayes & al. v. Goode & al. 7 Leigh 452. The presumption of' satisfaction is not the only consideration which operates on the court in refusing to entertain such a bill. In Hercy v. Dinwoody, 2 Ves. jun. 87. it was contended that the case was not open to the presumption of satisfaction, because, the matter being in suit, the defendants could not discharge themselves by a payment or settlement in pais. The master of the rolls admitted this, but said—“For the reasons given in Deloraine v. Brown, 3 Bro. C. C. 633. independent of the question of satisfaction, but on account of the very neglect, and the mischief and disturbance that may arise to families,” (and I may add, to subsequent purchasers,) “though the presumption of satisfaction is not so strong, yet the laches and neglect may make it a matter of public policy that the party guilty of it shall abide the consequences.” Here the property has passed into the hands of third persons, who have paid their purchase money; and whatever may have been the fact, there is certainly no proof that they had actual notice of this claim when the deed was procured from the trustees. The aid of a court of equity is now invoked against them, at a time when the truth is no longer attainable. Was there ever a valuation ? From Booth's trip to Tennessee to receive the land, the inference is strong that there had been: but we have no evidence of it. Was the contract changed, as Renfro alleges ? The evidence of Christian, that he received from Renfro 100 acres of land and 40 dollars, for Booth, would seem to shew that it had been. But what that contract was, and whether it had been complied with (as Rentfro, according to the testimony of Gardner, asserted, though Booth denied it,) we know not, and, from the proofs in the record, cannot ascertain. The first step must be taken in the dark, and no ad *167 vanee can be made without the hazard of injustice. It may be the misfortune of those asserting this claim, that such obscurity involves the transaction. But even if they were exempt from the imputation of laches, it would not be the province of a court of equity to relieve them at the risque of doing injustice to fair purchasers. Booth however, if his claim was a valid one, had ample opportunities to assert it during his lifetime. He failed to do so; permitted his vendee to remove from the country fullhanded, though his own embarrassments should have urged him to enforce his claim, if in truth it had not been adjusted ; and he himself subsequently absconded from his creditors, without giving them (so far as we see) any intimation of this claim as a means of satisfying their demands. Under these circumstances, he could not be exempted from the imputation of culpable neglect. I think that on this ground alone,-—the impossibility, from the lapse of time and the obscurity of the transactions, of arriving at the truth of the case, the court should have dismissed the bill.
I am equally satisfied that if the claim bad been asserted in proper time, the vendor’s lien did not attach. What did Booth dispose of? Not the property : to that he had no claim. Under his contract of the 9th of April 1795, he might have become entitled to an assignment of Jett's title bond, and to the possession of the property, upon the payment of the balance of the purchase money to Christian. But he never paid that balance; it was not paid until the contract was made with Rentfro; and upon its being paid by Rentfro, Christian assigned to his vendees, the Johnstons. Suppose, upon the payment of this balance by Rentfro, Christian had refused to surrender or assign Jett's title bond; what would have been the remedy ? Rentfro could have sued at law for the breach of contract in failing to assign the title bond : he had his election to adopt that course, and it would have been out of Booth's power to control him. What *168 then becomes of the supposed lien for purchase money? It will not be pretended that it would attach on the personal subject. The contract transferred a right of action, and nothing more.
It has been contended in argument, that there was an express contract for the lien, and that this is proved by the statement of Taylor, in the suit of Glenn against Christian. To that suit Booth was no party. The record would be no evidence against him, and cannot be used for him. But even if the statement were evidence, it proves no such contract. That is inferred from the fact that the papers were deposited with Taylor. But that deposit, I feel satisfied, had reference alone to the transactions between Christian and Booth. They had attempted to settle and ascertain the balance due. By the agreement of the 9th of April 1795, Christian was not to assign until he was paid; and the papers were no doubt deposited with a view to the delivery when he should be paid. And accordingly, when Rentfro did pay the balance, Christian transferred his interest held under Jett’s title bond, to Rentfro’s vendees.
I think the decree should be reversed, and the bill dismissed.
The other judges concurred on both grounds. Decree therefore reversed, and bill dismissed.